## STATE v. LEONARD C. KLAMMER.[1]

February 17, 1950.

No. 35,049.

W. E. Reyerson and Sidney P. Gislason, for appellant.

[1]Reported in 41 N. W. (2d) 451.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, and *Russell L. Frazee,* County Attorney, for the State.

THOMAS GALLAGHER, JUSTICE.

On April 30, 1948, defendant was convicted of a violation of M. S. A. 614.42 in permitting some 28 horses to die of starvation on his farm in Renville county. The horses, mostly young colts, had been purchased in and shipped from Montana to defendant to be slaughtered and used as feed for mink on defendant's mink ranch in said county.

Defendant was first tried in justice court before Justice J. R. Landy and there convicted. Subsequently, he appealed to the district court on the question of law alone. On May 11, 1949, upon the record made in justice court, the district court made findings, conclusions, and order for judgment of conviction. This appeal is from the judgment entered therein on June 15, 1949.

Defendant asserts that the evidence is insufficient to sustain his conviction, in that it clearly establishes that he did not have charge or control of the horses during the time they were permitted to starve and did not know of their condition during such period. It is undisputed that from about October 1, 1947, until their death, defendant was the owner of the 28 horses that died and of the farm upon which they were placed and subsequently starved to death.

On or about October 1, 1947, defendant employed Frank Degner to work on his mink ranch a short distance from the farm upon which the animals had been placed. In consideration for his services, Degner was to receive the sum of $100 per month; free use and occupancy of the buildings on the farm where the horses were enclosed; wood therefrom for his personal use; and, in addition, six tons of hay with which to feed his *own* livestock, consisting of three horses and seven cows. He was to spend his days at the mink ranch and to feed and otherwise care for 36 horses belonging to defendant, which included the 28 that died later and which were then in good condition on the farm.

On the latter farm was a pasture of six or eight acres, in which there was an old and moldy wheat and barley straw pile, unfit, for the most part, for animal consumption. Another straw pile which was then in the barnyard was later described by one Bernard Tersteeg, a retired farmer, who accompanied the deputy sheriff on an inspection trip of the premises, as "a big shell of frozen manure * * *, straw over the top and * * * eat under as far as they [the horses] could get." In addition, some 300 to 400 bales of mixed wild hay and quack grass, together with four loads of loose hay, were stored in the haymow of the barn. Of this amount, Degner was entitled to approximately six tons for his own stock, leaving only the remainder for defendant's 36 horses.

During the first part of November 1947, the pasture became covered with snow so that it was impossible for the horses thereafter to feed on the small amount of grass therein. Without success, they tried to eat some gooseberry bushes in a nearby grove, but could not because of long, sharp thorns thereon. They had eaten all of the edible straw in the pasture and barnyard sometime during November. The stored hay was entirely consumed by them by the middle of December. After a lake within the boundaries of the farm had frozen, at times they crossed over it onto a neighboring farm and attempted to eat some baled hay stored in the yard there, but they were driven away by the owner, who then enclosed his hay.

Up to November 17, 1947, defendant had made occasional trips to the farm to inspect the horses or for other purposes. On November 17, 1947, Degner, upon returning to the farm from town, found a note, written and signed by defendant and attached to the front door, which read:

"To Frank Dagnar [sic]:

"You are hereby discharged as of Nov. 17, 1947, for failure to report for work.

"Leonard C. Klammer"

Degner thereafter did not report for work and received no further pay from defendant. He continued to care for and feed defendant's

horses until the hay gave out about the middle of December. He testified he did this not because he was obliged to, but "in my good-hearted way."

Subsequent to November 17, 1947, defendant did not again visit the farm until February 7, 1948. No additional hay or feed was delivered by him for his horses. On November 22, 1947, he received a communication from the Minnesota Society for the Prevention of Cruelty as follows:

"Klamer [*sic*] Mink Farm
R. F. D.
Buffalo Lake, Minnesota
"Dear Sir:

"We are in receipt of a report from one of our observers in your district, who reports that you have a bunch of horses that get no feed except what they can paw out of the dried up pastures, that they are also without shelter.

"If the report is true as stated you are liable to arrest and prosecution under the State Humane Laws, and that said horses maybe [*sic*] removed from the farm by the authorities, and placed in the hands of others to care for at the owners [*sic*] expense.

"Find enclosed copy of the laws. Please read carefully and be governed accordingly, otherwise court action may be necessary.

"As soon as you have made the proper corrections, kindly let us know at once, that we may clear the matter on our records.

"Find enclosed envelope for your reply.

> "Respectfully yours,
> "MINNESOTA SOCIETY FOR PREVENTION OF CRUELTY
> James Nankivell
> Executive Agent."

He replied thereto as follows:

"Klammer Minkery

> "Hutchinson, Minnesota
> November 24, 1947.

"James Nankivell,
Executive Agent,
Minnesota Society for Prevention of Cruelty,
State Capitol Building,
St. Paul, Minnesota.

"Dear Sir,

"Your letter of November 22, has been received.

"If you will indicate what group of horses your informant refers to, I will be better able to give you the information you request.

"Until recently I kept horses for slaughter in two separate pastures. A few days ago all animals were removed from the outlaying [sic] pastures to the main ranch where they are fed daily.

"In all probability these were the horses referred to by your informant, and that situation complained of has already been corrected.

"Yours very truly,

"Leonard C. Klammer"

It is undisputed that at the time of the reception of such letters the defendant had terminated Degner's employment; that he had not replaced him with anyone to look after the horses; that he had not removed them from the farm to his main ranch, as the letter set forth; and that subsequent thereto he did nothing to ascertain whether they had sufficient feed or to provide them therewith. He did not visit the farm until long after the horses had died, and, insofar as the record discloses, did not know or care whether or not Degner still continued to reside thereon.

During December 1947 Degner made several trips to Hutchinson, where defendant maintained his offices, to report the need for additional hay or feed on the premises, but on such occasions he was unable to find defendant in his office.

As previously stated, by December 15, 1947, the hay and edible straw had been completely consumed. Thereafter, within approximately eight weeks, 28 of the 36 horses died from starvation. In February 1948, the sheriff of Renville county, having been advised of the situation, caused an investigation to be made. Bernard Ter-

steeg, who accompanied the deputy sheriff, testified that he then found dead horses in the barnyard, around the rotten straw pile in the yard, and in the pasture; that the dead horses were thin and emaciated; that the few horses still alive staggered about with their bones protruding; that one was lying down, unable to get to its feet; and that no feed whatever was found on the premises. Tersteeg testified:

"* * * I never saw anything like it in all my days. There was dead horses laying all over the premises. There was a few horses alive that could just navigate, walking along, nothing but hide and bones, and one horse laid there; we turned him over, we looked him over."

■ M. S. A. 614.42, upon which these proceedings are based, provides:

"Every person who shall:
* * * * *
"(2) Deprive of necessary food, water, or shelter any animal of which he has charge or control;
* * * * *
"Shall be guilty of a misdemeanor."

Defendant asserts that the horses were not in his charge or under his control, but were in the charge and under the control of Frank Degner at the times in question. However, on November 17, 1947, Frank Degner's employment was terminated by defendant's notice to such effect. Thereafter, Degner remained on the premises, presumably without defendant's knowledge, as a tenant at sufferance. No legal obligation rested upon him to provide either feed or labor for the care of the horses. Humanitarian principles, of which he seemed to possess a minimum, caused him to care for them for a short time thereafter.

His notice of discharge was without reservation, qualification, or condition of any kind. It was outright and terminated his employment as of November 17, 1947. It is difficult to understand, notwithstanding this fact, how defendant can seriously assert that

Degner thereafter continued to have charge and control of the horses with full responsibility for their care. After November 17, 1947, he was no longer an employe of defendant and owed him no further obligation. From that date the entire responsibility for caring for the horses rested squarely upon defendant. Thereafter, not knowing whether Degner still occupied the premises, not knowing who was caring for the horses, and with notice from the Minnesota Society for the Prevention of Cruelty to the effect that some of his horses had been reported to be without feed, he took no steps whatever to investigate their condition or provide for their care. We hold that this undisputed evidence is amply sufficient to sustain his conviction.

■ Defendant contends that he had no actual knowledge of the condition of the horses after November 17, 1947, and that therefore the evidence upon which his conviction is based must be held insufficient. The record indicates the contrary. He had knowledge that the horses were on the farm owned by him, where he had discharged the man employed to care for them. He had knowledge that the hay and straw originally stored upon the premises as feed for them would not sustain them for more than a short period. He had knowledge by notice from the Minnesota Society for the Prevention of Cruelty that some of his horses had been reported without feed. These factors in themselves would establish sufficient knowledge to place him upon inquiry and investigation. Certainly this much responsibility rests upon the owner of enclosed animals.

Defendant relies for support upon Muhlhauser v. State, 1 Ohio Cir. Ct. R. (N. S.) 273, 15 Ohio Cir. Dec. 81, and Commonwealth v. Barr, 25 Pa. Dist. 879, 33 Lanc. L. Rev. 113.

In the Muhlhauser case, it was established that the owner of the animals in question had provided all facilities for feeding and watering them, but that, after the owner had placed full control of the animals in the foreman and had then left the premises where they were located, the foreman failed to make use of the feed and facilities provided.

In the Barr case the court held (25 Pa. Dist. 881, 33 Lanc. L. Rev. 115) :

"* * *. Barr [defendant] was away on business, and left his men to look after his chickens. Unless he clearly foresaw that this result [disease and starvation] would happen if grain were not fed with the mangels [a species of beet] to the chickens, * * * he is not guilty of this offense; * * * where he is absent at the time, knowledge and approval must in some way be brought home to him."

Here, as previously stated, defendant had no employe in charge of his horses, had failed to provide the facilities for feeding and otherwise caring for them, and had notice and knowledge of their situation sufficient to place him upon inquiry.

Affirmed.

---

[1]Reported in 41 N. W. (2d) 438.